## Bailey's Estate.

*Welsh & Brown, Francis Shunk Brown* and *Otto R. Heiligman,* for exceptants.

*Joseph Carson, Henry J. Rebman, Hampton L. Carson* and *James Gay Gordon,* contra.

GEST, J., March 31, 1930.—On June 19, 1925, Emilie Bailey Collet, the daughter of the testator, presented her petition to the court, praying for a citation directed to David E. Hilsee, Harvey Gourley and William K. Haupt, trustees under the will of Charles W. Bailey, to show cause why they should not be dismissed as trustees, and the trustees filed their answer to the said petition. A replication having been filed, the case was, on Sept. 26, 1925, referred to a master, who filed his report on June 14, 1927, recommending that the respondents be dismissed. Exceptions having been filed by the

respondents and argued by counsel, it appeared that the sole petitioner was the life-tenant under the testamentary trust, and the court being of opinion that the petition was defective for want of parties, the master's report was referred back to him, and other persons interested in the trust estate were brought in by citation, etc. The master filed a supplemental report on Sept. 14, 1928, again recommending that the respondents be dismissed, and, on the argument of exceptions thereto, the report was again referred to the master in order that the petitioner might be cross-examined by counsel for those parties respondent who were not original parties to the proceeding. On June 20, 1929, the master filed his second supplemental report, again recommending a decree dismissing the respondents as executors and trustees under the will of Charles W. Bailey, deceased, and directing them to pay the costs. Exceptions having been filed by the respondents, the case was elaborately argued before Lamorelle, P. J., Gest, Henderson, Thompson, Van Dusen and Stearne, JJ. In consultation, the court was equally divided, Lamorelle, P. J., Henderson and Van Dusen, JJ., voting to dismiss the exceptions filed to the master's report and to enter a decree dismissing the respondents as executors and trustees according to the master's report, Gest, Thompson and Stearne, JJ., voting to sustain the exceptions and dismiss the petition. The court being equally divided, it appeared that no decree could be entered, and so, in accordance with the procedure as suggested in Madlem's Appeal, 103 Pa. 584, approved in Summers v. Kramer, 271 Pa. 189, the Hon. E. Foster Heller, P. J., of the Orphans' Court of the 11th Judicial District, was called in to sit at a reargument and decide the case. A reargument was accordingly had before the six judges of this court and Judge Heller, and the latter, having read and considered the testimony, the reports of the master and the briefs of counsel, voted to sustain the exceptions to the master's report and dismiss the petition. Judge Thompson died suddenly before the opinion of the court could be written. He, however, had read and concurred in a draft opinion which was substantially the same as that now filed as the majority opinion of the court.

We may say that all the six judges of this court and also Judge Heller have read the entire record of the case.

We shall now indicate the grounds of our opinion. To review in detail all of the record, which comprises over 1250 printed pages, would be scarcely possible and we think unnecessary. We shall confine ourselves to a brief discussion of the important features of the case.

1. It is a serious matter to dismiss trustees appointed by will; much more should be shown by those who wish them dismissed than would be the case where the trustees are appointed by the court. Perry on Trusts (6th ed.), 276, cited on page 77 of the trustees' first brief, says: "The power of removal of trustees appointed by a deed or will ought to be exercised sparingly by the courts. There must be a clear *necessity* for interference *to save the trust property*. Mere error or even breach of trust may not be sufficient; there must be such misconduct as to show want of capacity or of fidelity putting the trust in jeopardy." The trustees' brief cites several cases in support of this.

2. It is well worthy of consideration that of all the persons interested as beneficiaries or possible beneficiaries of this estate only Mrs. Collet wishes to remove the trustees; all the others either desire their retention or elect to remain neutral. To be sure, Mrs. Collet has much the largest interest; nevertheless, the attitude of the others should have some weight.

3. It is strongly urged and indeed is the gravamen of Mrs. Collet's complaint that White's resignation as one of the trustees, upon which there followed automatically the appointment of Hilsee in his stead, was fraudulently

brought about by the conspiracy of Hilsee and Gourley. White was to be a trustee, according to the will (paragraph 15), only so long as he retained his office or position with Bailey, Banks & Biddle Company, and upon his leaving the service of the company "from any cause" he was disqualified from acting under the will. And by paragraph 17, in the event of his disqualification, the testator appointed Hilsee in his place. We have not the slightest doubt from the testimony that White was properly removed as a director of Bailey, Banks & Biddle Company, as he was incompetent, having neither the necessary knowledge or experience in the jewelry business and was the cause of irritation and dissatisfaction. Hilsee, on the other hand, was a practical jeweler and well qualified to conduct the business of the company, which prospered accordingly. It will be remarked that Mrs. Collet was, and is, entirely willing for White to leave the directorate of the company, but she claims that he should have been retained as trustee, contrary to the express terms of the will. Mrs. Collet does not even now ask that he be restored as trustee, nor does White himself demand it. Mrs. Collet simply urges that all the circumstances connected with his retirement were not stated to her at the time; in other words, the only fault alleged of Gourley and Hilsee is a lack of frankness. It is true that she was not expressly told that his dismissal from Bailey, Banks & Biddle Company would result in his retirement as a trustee, but she either knew it or should have known it. According to Gourley's testimony, he had a conversation with Gest, J., when he presented the petition to the court for Hilsee's appointment, which is found on page 505a and in the trustees' brief, page 30. Judge Gest does not remember the facts, but could not say that Gourley's testimony is not true, and the general proposition is correct that, where a vacancy occurs in the trusteeship, his successor, appointed by the will, takes his place automatically. If all the facts had been stated, the court might have called for further explanation or directed notice, but White's resignation as a trustee was voluntary; he need not have made it, and, in the long run, we think the same result would have followed.

4. The Lawyer account. The testimony as to this is difficult to analyze. The master was of two minds, possibly three. First, he thought it was principal, and that the trustees were wrong in paying to Mrs. Collet the $25,000 received in the settlement from Bailey, Banks & Biddle Company; then he thought it was income, and, finally, that it was neither principal nor income of the Bailey Estate, because it was earned by the capital of Bailey, Banks & Biddle Company (pages 931 a, 1200 a, 1203 a). He thought this was ground for dismissal of the trustees on the petition of the woman who actually got the money (page 1204 a), Bailey, Banks & Biddle Company making no claim thereto. But even if the payment was erroneously made, it was made in good faith, and afforded no ground for dismissal. It seems to us the indebtedness of the Lawyer account to Bailey, Banks & Biddle Company, at the time of Charles W. Bailey's death, was a debt of his estate and should be paid by it, which we understand was done. The agreement of C. W. Bailey and Bailey, Banks & Biddle Company (see page 395 a) provided for the termination of the agreement by either party giving to the other six months' notice in writing prior to March 1st or Sept. 1st in any year. No written notice was given, but that seems to have been waived by the acts of the parties, and the Lawyer account was wound up as of Oct. 1, 1923 (page 1036 a), when the assets were transferred to the company in consideration of $35,126.39 cash paid. $10,042.79, representing the inventory value of the assets, was credited to principal and $25,083.60 paid, as income, to Mrs. Collet (pages 787 a, 1135 a). We are inclined to think that this was properly income earned by a capital

asset of the estate, viz., the inventory and the valuable contract with Bailey, Banks & Biddle Company. While all this is subject to further critical examination, we are clear there is nothing in the Lawyer matter to warrant the dismissal of the trustees.

5. The purchase of preferred stock of Bailey, Banks & Biddle Company by the estate was good business. It was authorized by the will and has been profitable. Mrs. Collet does not even suggest that it should be sold, which she should do to be consistent. This charge should be dismissed without further comment.

6. The Haupt deal in commercial paper was reprehensible. The trustees had no legal right to do it, especially as we think it was probably a loan to Haupt secured by the commercial paper, rather than a purchase of the latter with Haupt's guarantee. This took place in March, 1923, and the notes were paid in September, 1923. The interest on the loan was paid, however, and no loss resulted. So, also, the loan to Bailey, Banks & Biddle Company was authorized, yet, as a temporary loan to the company, whose stock constituted practically the entire estate, it was not a *devastavit*, as the security was really better than that of the stock itself. The loan was repaid with interest, and, in our opinion, isolated transactions of this kind, which result in no loss to the estate, do not warrant a dismissal. Frequently trustees invest in unauthorized investments for the benefit of their *cestuis que trust*, and have never, to our knowledge, been dismissed where no loss has occurred.

7. The Kind offer. This was so manifestly impossible that we do not think it necessary to discuss it in detail. Mrs. Collet does not complain because it was not accepted, but because the trustees did not "meet the man." This seems to us absurd. The proposition was in writing and spoke for itself. We think the trustees were entirely right and acted with good judgment.

8. The sale of fifty shares Bailey, Banks & Biddle Company was, in our judgment, honestly conducted. It was proper to offer it at public sale, buy it in at less than 100, the agreed price, and then make up the difference. No possible loss or harm resulted to any one.

9. The other charges are unimportant. We cannot say, in view of the doubt about the Lawyer account, that the trustees were not justified in withholding Mrs. Collet's income until they should be made secure. And, in view of the lady's sometimes overdrawing her letters of credit, the other matter complained of was not improper.

10. The effect of the dismissal of these trustees upon the estate and also upon the business of Bailey, Banks & Biddle Company would, in our opinion, be most disastrous. The welfare of the estate is bound up in the success of the business, and the testator in his will shows that he fully realized the bond between the two.

11. The effect of the dismissal of these trustees will probably, or at least may possibly, lead to their dismissal in the estate of Joseph T. Bailey, as it would then appear that they are unworthy of confidence in a fiduciary capacity.

12. The petitioner was evidently prompted in the preparation of her petition by Miss Bitner, an employee who was discharged in April 1925 (page 847 a), who admitted her hostility to Hilsee (pages 848 a, 857 a, 860 a, 865 a, 870 a). If, then, Miss Bitner, with intimate knowledge of the affairs of the trustees and of Bailey, Banks & Biddle Company, could find nothing else to complain of, it is clear to us there are no other charges.

Judges Stearne and Heller concur in this opinion, and, as stated above, Judge Thompson approved it in draft form.

The exceptions to the master's report are sustained and the petition of Emilie Bailey Collet is dismissed, at the cost of the petitioner.

LAMORELLE, P. J., and HENDERSON and VAN DUSEN, JJ., dissenting.—Mrs. Knowles, now Collet, daughter of the testator, and the principal recipient of the income of the estate, seeks the removal of the trustees under his will. Among the grounds of removal found in section 53(a) of the Fiduciaries Act of June 7, 1917, P. L. 447, is the following:

"9. When all the cestuis que trust, or a majority of them, having the life estate under any trust, shall desire the removal of the trustee or trustees upon any substantial ground not hereinbefore enumerated, and the court, upon petition filed by them or any of them, shall be satisfied that such substantial ground for removal exists; in which case, the court may remove said trustee or trustees and appoint another or others as chosen by said parties."

As the commissioners note in their report, this last paragraph was taken from the Act of April 9, 1868, P. L. 785. That statute seemed to put the removal absolutely in the hands of the life-tenant. As construed by the courts, however, the mere wish of the life-tenant was not sufficient (Stevenson's Appeal, 68 Pa. 101), but substantial grounds for dissatisfaction were required. This expression was carried into the revision, so that the statute now conforms to the court's construction of it, and decisions under the Act of 1868 are still serviceable.

The substantial ground spoken of in paragraph 9 is one "not hereinbefore enumerated," and as the other paragraphs describe various forms of malfeasance, neglect and incompetency, it must be something other than these: Martin's Estate, 4 Dist. R. 219, in which Ashman, J., said: "What, then, was the purpose of the Act of 1868? We think it can be explained by a reference to the relations which necessarily exist between the trustee and the beneficiaries. These differ from most business and many fiduciary relations, in being eminently personal in character. A cestui que trust has a right to demand something more of his trustee than he would expect of his tailor or banker—mere honesty and good judgment and skill. He consults the trustee, not as an agent, but as his confidential adviser, and his dealings with an adviser should not be at arm's length. It is easy to see how a trustee may be both upright and capable, and how his demeanor towards the cestui que trust may yet be such as to engender suspicion and even hatred. In that case, the fancied jeopardy to the estate would be as real to the mind of the cestui que trust as if it existed in fact."

In Neafie's Estate, 199 Pa. 307, the court said: "As any man may be mistaken in his estimate of the integrity and business capacity of another, when the latter becomes the former's trustee and his unfitness for the position appears to the court there should be no hesitancy about his removal. If his management of the trust justly subjects him to criticism and to a lack of confidence by the cestui que trust, he should not be continued in control of the estate. The relation of trustee and cestui que trust is one of confidence, and when either abuses that confidence, he must assume the responsibility. Pleasant personal relations between the parties interested in the trust is desirable, and it is a duty incumbent upon each to aid in securing that object."

In Marsden's Estate, 166 Pa. 213, the trustee was a brother of the beneficiary, and had not spoken to her for several years before the trust began. He made extensive repairs on dilapidated real estate without consulting her, and he lived in another city. Penrose, J., in the court below, said: " 'The power of the court under the Act of April 9, 1868, to appoint a new trustee, while it is not to be exercised capriciously, or at the mere whim of the cestui que trust (Stevenson's Appeal, 68 Pa. 101), is not dependent upon the misconduct of the trustee sought to be superseded; and it is enough to show that·his reten-

tion, by reason of the existence of hostile relations between him and the *cestui que trust*, would naturally work disadvantage, inconvenience or great discomfort to the latter: Hillis's Estate, 9 W. N. C. 421. See, also, Kellberg's Appeal, 86 Pa. 129; Seyfert's Estate, 3 W. N. C. 565; Gaul's Estate, 12 Phila. 13.' "

We feel that petitioner's loss of confidence in her trustees is justified, and will refer to the causes which seem to us the most important.

1. Testator was the president and principal stockholder of a company which operated a prominent and old-established jewelry store. His trustees are his lawyer and the company's lawyer, Harvey Gourley, the president of the store company, David E. Hilsee, and a note-broker, William K. Haupt. The will originally appointed Frank A. White to the position now occupied by Hilsee, and White qualified as executor. He had been brought into the store by testator as a result of associations during the war, and had become the testator's personal, confidential man, and a vice-president of the company. The will provided that one executor should be an officer or employee of the store, and that two should not; that if the person appointed because of his position in the store should leave the service of the company, he should be disqualified as executor; and that if White should be disqualified, his place should be taken by Hilsee. Hilsee became president of the store company after testator's death. About two months later he requested White's resignation on the ground that his position in the store as a comparative newcomer without knowledge of the business caused dissatisfaction among the employees. After some discussion with Gourley, White submitted and resigned his place in the store and his executorship.

If White was honestly discharged from the store as a matter of store policy, the decision must be accepted, although the man principally responsible for it was the man who benefited by it. For practical purposes, testator put it in the power of Hilsee as president, with the executors as principal stockholders, to do that very thing. But the master finds (and his findings have the force of a verdict) that there was no ground for the complaint against White, and that Gourley and Hilsee conspired to get rid of him for Hilsee's benefit. This finding must be accepted, as there is ample evidence to support it; and the court *in banc* may not reverse the finding of the master on this point.

Indications of motive which have particularly struck our notice are these:

Gourley and Hilsee deny any consultation before Hilsee asked White to resign. This is against nature; and Hilsee elsewhere says that he consulted Gourley, Haupt and others before taking the step (page 722 *a*).

Hilsee says that when he asked for White's resignation he did not know of its effect on the executorship. This, too, is incredible; and Hilsee elsewhere says (page 771 *a*) that one of the reasons he gave White was "your work is done as far as the preliminaries of the estate are concerned." White's written resignation repeats this reason.

White testifies that Gourley's own explanation of his motive was: "If you can definitely show me how you can win out without assistance, but well, if I stand by you and you lose out, I will lose out."

Gourley rushed Mrs. Knowles by telegraph into a consent to White's retirement from the store, without explaining to her its effect on the executorship; and he used her consent to procure White's acquiescence. There was plenty of time to explain by letter.

It was necessary to get the Orphans' Court to enter a decree that White's office was vacant; and in doing so, it was represented to the court that it was not possible to give notice to the parties within a reasonable time, and that

the whereabouts of some of them were not known. It was perfectly possible to give notice to Mrs. Knowles, as the executors had just been communicating with her; and she was vitally interested in knowing what was being done. There is nothing to show that she knew White was to retire as executor until it was all done.

The executors settled some details about White's retirement by a written agreement with him. In this it was provided that if the court did not declare his office vacant, nevertheless, he would not function. That is to say, if the court did not approve what they were doing, they would do it anyhow.

2. The trustees had some uninvested money. They loaned it to one of their number, Haupt, the note-broker, and he gave them his own note and some good commercial paper, and the estate received 6 per cent. interest until the amount was paid back by Haupt. They now say it was an investment in the good commercial paper. If so, it was not the kind of investment that trustees ought to make, even though they had authority to make other than legal investments. Moreover, the executors' account had not been settled. The fund then belonged to unascertained creditors, if any; and such an investment should not be made until it was demonstrated that there was none such.

At the time they did it they wrote down in their books that it was a loan to Haupt, and they called it a loan to Haupt when they filed their formal account; they paid the money to Haupt, and they got it back from him. The master finds that it was a loan to Haupt, and he could not well have done otherwise. It is true that the security was the same whichever way the transaction is regarded, and that no loss was suffered. But motive and purpose make all the difference, and the rule is absolute, that trustees shall not lend trust money to themselves. It is conceded on all sides that this transaction was reprehensible. Now that the trustees are charged with the fault they stubbornly deny the evidence of their own actions, and do not thereby increase confidence in themselves.

3. Testator operated a factory known as the E. S. Lawyer Company, which did repair work for the store. His agreement with the store was fair enough on its face, but as actually carried out (according to the testimony of the trustees), it was grossly unfair because of the amount of expense improperly charged to the store. The result was that the Lawyer factory made a large profit for the testator. The executors, knowing this, decided that the Lawyer factory must be discontinued, though they might have tried to operate it under the express power given in the will to see whether a legitimate profit could be made. Mrs. Knowles objected to the discontinuance, and the trustees agreed to go on operating until $25,000 was produced as income for her. They did this, and then wound up the business.

A great deal has been said as to whether this $25,000 was income or principal, and as to the details of winding up the Lawyer business. The transactions between the trustees and the store company are confusing, but we do not think it is necessary to try to unravel them. The findings made in this proceeding with regard to this transaction are not to prejudice the beneficiaries under the will, as the question is not at issue between them here, and is the subject of a separate proceeding. For present purposes the serious thing is this:

According to the trustees' own statements, the money was made at the expense of the store company. Hilsee and Gourley were directors in the store. Hilsee was trustee and Gourley was counsel (he is now also trustee) of the Joseph T. Bailey Estate, which also held stock in the store. Instead of doing the right thing (on their own version of the facts), they did the wrong thing

at the expense of their company and of the other fiduciary interest in order to placate Mrs. Knowles. How will they decide when the next conflict of interest comes?

Hilsee also thought fit to add another complication by telling Mrs. Knowles that the Lawyer business was discontinued because of the request of her uncle and aunt, who were interested in the Joseph T. Bailey Estate. The uncle had, in fact, objected vigorously in the name of himself and the aunt. Mrs. Knowles took offense at this, as Hilsee well knew. When the aunt learned the reason for Mrs. Knowles's coolness, she came to Hilsee demanding that he deny the story. He got Gourley to write the aunt a letter denying it, and himself wrote to Mrs. Knowles a letter, in which he did not deny it to her, but related that he also had denied it to the aunt.

This letter shows him unashamed of his attempt to satisfy the aunt with one story and Mrs. Knowles with another. It is this incident which first shook the petitioner's confidence (page 989 *a*).

4. Income had been withheld from petitioner with her consent to meet certain of her liabilities. After this proceeding was begun, she demanded it, and still it was not paid. An informal complaint was made to the court, and (as we well remember) the excuse then given was that the sum was needed to pay the petitioner's income tax, and not, as now alleged, that it was needed to protect the trustees with respect to the payment of $25,000 to petitioner on the Lawyer account. That question had not yet arisen. When told by the court that they had no responsibility for the income tax, the trustees made the delayed payment.

But Haupt gave the petitioner this explanation of the delay (page 991 *(a)*: "If the heirs let things alone, they would get what was coming to them; if they did not, they would not." Section 53 *(a)*, 6, of the Fiduciaries Act gives as one of the grounds for removal:

"6. When such fiduciary fails or neglects to pay over the principal or income of the estate, according to his duty under the trust, or fails or neglects to comply with any order or direction of the court made in relation to said trust; . . ."

5. The trustees used the only money they had which was not invested in store company stock (including some income) to buy more stock. This may seem unwise, but it was a question of policy and expressly authorized by the will. But in the agreement of purchase they obtained an option on other shares which made up all the holdings of the seller. They say that the option was intended for Hilsee, and it was actually exercised by him with the temporary aid of company money. There is something to be said for this additional purchase as a matter of policy; but it was not necessary, and the trustees should have been sensitive to the absolute rule which forbids the use of trust funds to procure, even indirectly, an advantage for themselves.

It is argued that the management of the store under the control of the trustees has been successful. Lack of character is dangerous, even if no loss has yet resulted; and we feel that the estate is in jeopardy. Section 53 *(a)*, 8, of the Fiduciaries Act.

It is also argued that the petitioner has condoned many things of which she now complains. Want of confidence may be of slow growth, and when the break comes, the whole conduct of the trustees may be reviewed. The question is not her conduct, but theirs. The same may be said of the fact that the remaindermen support the trustees or remain neutral. Paragraph 9, above quoted, makes the attitude of the life-tenant of prime importance.

It is hard to understand why there should be any hesitation to dismiss the trustees here, because this may be followed by their removal in another estate. The personal consequences to themselves of a dismissal do not improve the safety of the estate or the confidence of the beneficiary.

In general, we would enter a decree sustaining the master and dismissing the trustees, and would act upon the exceptions as follows:

Of the exceptions of the trustees to the first report of the master, the following should be sustained: No. 16. The relations between this estate and the store were very intimate, and, in view of the broad power of investment, we cannot say that temporary investment in the store's commercial paper was wrong. Nos. 21 and 29, because the matters involved are not fairly the subject of complaint. Nos. 45 to 48, inclusive, were sustained by the master. Nos. 26 and 27 should be sustained. This accords with the final conclusion of the master in the light of further evidence (see 17th exception of the trustees to the second supplemental report, and all Mr. Heiligman's exceptions to the same report) and with our own conclusion. No. 35, because the errors in bookkeeping are not serious (No. 36 goes too far the other way). No. 37, because we do not find any serious withholding of information on request. (No. 38 goes too far the other way.) Nos. 41 and 42, because the facts are true, though unimportant.

Exception No. 15 to the first supplemental report should be sustained, so far as to find that J. Trowbridge Bailey, for himself and his sister, objected to the Lawyer factory. Exception No. 16 to the first supplemental report should be sustained.

All the other exceptions of the trustees to the original and the first supplemental report, and all their exceptions to the second supplemental report, and all Mr. Heiligman's exceptions to the second supplemental report, should be dismissed, without prejudice to the rights of his clients in other proceedings. His exceptions to the first supplemental report have already been sustained by the court.